LOTTINGER, Judge.
This matter is before us on an appeal taken by the plaintiff, Suzette Thomas, from a judgment rendered by the Lower Court in favor of the defendant, St. Paul Mercury Indemnity Company, rejecting the demands of the plaintiff and dismissing her suit.
The suit involves a claim by the plaintiff under the Workmen’s Compensation Law of the State of Louisiana, LSA-R.S. 23:-1021 et seq., arising out of the death of her son, one Henry Thomas, while in the course and scope of his employment. The plaintiff alleged that she was dependent upon the deceased within the purview of the compensation statute, and thus is entitled to the benefit provided for dependents.
The case presents no dispute concerning the accident and resulting death of Henry Thomas; furthermore, there is no dispute concerning the insurance coverage by the defendant. The only point at issue is whether or not the plaintiff was in fact dependent upon the deceased such as to entitle her to the benefits provided by *738 the Workmen’s Compensation Law of our state.
One Elmo Robb, manager of Robb’s Drugs, Inc., testified that the decedent, Henry Louis Thomas, was employed as a delivery boy by his concern and that his regular salary as such amounted to the sum of $28.50 per week. This witness testified further that the decedent claimed four dependents in connection with the withholding regulations of the United States Government. His records did not, however, reflect the names of these dependents.
Suzette Thomas, the plaintiff, and mother of the deceased, testified that her husband, Willie Thomas, the father of the deceased, had been dead approximately twelve years; that the deceased was the issue of the marriage between the plaintiff and her deceased husband, Willie Thomas. She testified that of this marriage nineteen children were born of which thirteen lived and that, at the time of his death, Henry Louis was the second to youngest, being then eighteen years of age. All of her other children, she testified, had families except the last two, Henry Louis and Herman, the youngest, who was single. The plaintiff testified that she had no job and that for her support she was entirely dependent upon Henry Louis, Herman and the Welfare Department of the State of Louisiana. Her other children, she stated, all had families and were not able to contribute anything to her support. The funds which she received or was receiving at the time of the death of the deceased, amounted to the sum of $33 which she received every month from the Welfare Department, $15 a week which s'he received from Henry Louis and $10 a week which she received from Herman. The witness testified that these sums were received by her from the sources stated on a regular basis. The plaintiff admitted that at the time of the death of Henry Louis, he was not actually living with her but was living with a girl called Pearl, but that in spite of this, he would visit her home each day and even kept his clothes- at her home. She stated that Henry Louis had lived with Pearl for some three months before his death and that they had an apartment together. She stated that she herself lived in a home which belonged to her daughter, one Alvina Ferdinand, who lived in California. Her further testimony was to the effect that she and Herman (and Henry Louis prior to the time that he moved away to live with Pearl) occupied one side of this house and that Mary Thomas, Amelia Rumsey and Jack Rumsey occupied the other side of this house. Amelia Rumsey is her daughter and so is Mary Thomas. She stated that rent was paid to Alvina in the amount of $24 a month, $12 coming from the occupants of either side of the house. She stated that the $12 which she paid was contributed by her sons, Henry Louis and Herman. The utilities were paid, she stated, by Amelia Rumsey and Mary Thomas. At the time of trial she stated that she was still on the Welfare and that Herman was still contributing $10 a week for her support.
On cross-examination this witness testified that the $12 rental money came from the amounts contributed by her two sons and was not in addition thereto. She repeated that the deceased had lived with his concubine for some three months prior to his death, but stated that he would take at least one meal with her each day. She repeated that he h'ad never moved his clothes from her home and testified that she did not know whether he supported -his concubine or not, she having never visited their apartment. She did admit, however, that after Henry Louis met his death, Herman removed some clothes belonging to him from the apartment which he shared with the said Pearl.
One Mary Thomas testified, stating that the plaintiff was her mother and confirming the testimony of the latter to the effect that she had thirteen children, Herman and Henry Louis being the youngest two. She stated, as did the plaintiff, that the plaintiff and Herman (and the deceased when he was alive and before he moved away to *739 live with Pearl) occupied one side of the house while she, Amelia and the latter’s husband occupied the other side. She also stated that Henry Louis had moved away and lived with Pearl approximately three months prior to the time he died. She stated further that the plaintiff did not work and that she was supported by the Welfare and the contributions of the two sons. She stated further that the two sons made regular contributions, Henry Louis giving the amount of $15 and Herman the amount of $10 each week. Further, she stated that after Henry Louis had moved away, that he continued making the weekly payments as he had when he lived with his mother.
On cross-examination, this witness stated that she was always around the house and that she actually saw Henry Louis make the $15 contribution each week. She stated that the plaintiff had some of his clothes at the apartment which he shared with Pearl and that he ate most of his meals there, only occasionally eating at his mother’s.
Herman Thomas testified that he was the youngest of the family, that his mother received $33 per month from the Welfare Department and $10 and $15 per week, from him and Henry Louis, respectively, when the latter was alive. He stated that Henry Louis had made his contributions of $15 per week for a period of approximately six years before his death and that he continued to make these payments after he moved away and lived with Pearl. This witness stated that in addition to the salary received by Henry Louis, he also received substantial tips as a delivery boy. On cross-examination, this witness stated that to all intents and purposes when Henry Louis went to live with Pearl he moved out of his mother’s house and that they lived together as man and wife in their apartment. He also stated that during this time Henry had an automobile, which he (Herman) and Henry Louis both used.
Edna Johnese, testifying on behalf of the plaintiff, stated that the latter was her mother and corroborated previous testimony relative to the family. She stated that the house belonged to the sister in California and that she collected the rent and sent it to her. This witness went on and stated that she saw Henry Louis and Herman, respectively, give the sums of $15 and $10 to her mother each week, and that insofar as Henry Louis was concerned, that had been going on ever since he had gotten out of high school. In addition to the income received by the deceased from his employment from the drug store, she stated that he made extra money by cutting lawns and that she had on occasion given him $3 to cut her own lawn. The $15 weekly contributions by Henry, she stated, were continued after he had moved from his mother’s house and lived with Pearl.
It was stipulated that the testimony of Amelia Rumsey, were she called to the stand, would be merely cumulative.
The defendant called as its witness the decedent’s concubine, Pearl Riley. She stated that she had been the common law wife of I-Ienry Louis for some two and a half years during which time they lived at the home of her mother, and that on November 28, 1954, they moved into the apartment which they occupied at the date of Henry Louis’ death. She testified that the apartment was unfurnished, had four rooms and was furnished with furniture bought by them. The rent she stated was $28 per month of which she and Henry Louis paid $14 and the remaining $14 of which was paid by two other persons living in concubina ge, one Henry Collins and one Mary Prater. The groceries for the couple were purchased principally at Dave Owens’ grocery near by and according to this witness, they ran from $16 to $18 per week. She stated that the decedent was making from $25 to $28 per week at the time of his death but that she knew nothing of any extra money which he earned by mowing lawns. She further stated that she earned $16 a *740 week as a house servant and that the deceased, on each payday, would give her most of what he had earned and that they would take the money, put it together and pay the bills. She also testified with reference to the automobile that was owned by the decedent, the fact that he used it and the fact that oil and gas was bought and paid for. She stated further that after the bills were paid that there was no money left over. Insofar as contributions to the mother of the decedent were concerned, this witness stated that he never told her whether or not he gave his mother any money but that she was sure that if he did give her money, she would have known about it. On cross-examination, this witness admitted having signed a statement wherein she recited that she knew that the decedent was giving his mother part of his salary and while she did not know what amount he gave her, there was a definite contribution each payday. 'She explained the conflict between the contents of the written statement and her testimony above referred to as a result of the fact that when she gave the statement, the plaintiff had told her to say it in that manner and that she was nervous and scared and complied with the plaintiff’s wishes.
On redirect examination she stated that she did not really know whether Henry Louis ever gave his mother any money or not.
Miss Stat Sumrall, Welfare Visitor for the East Baton Rouge Parish Department of Public Welfare, testified that she was familiar with the case of Suzette Thomas. She had a record of the amounts of payments received by the latter during the two year period previous to the trial, and while she could not divulge the information therein contained, she verified what the attorneys had found from a checking of these public records. It would serve no useful purpose to detail the various amounts received by the plaintiff from this agency, but we might observe that the payments made to her were more or less as testified to by the plaintiff herself.
One Feltus Payne testified that he was the owner of the apartment occupied by the decedent and his concubine. He stated that they moved in on the 29th day of November, 1955, that they shared the apartment with Mary Prater and Henry Carter, and that he was paid the sum of $28 per month rent. Pie testified that he saw the deceased and Pearl every day, that they ate there at the apartment and that frequently he would eat with them. While they would occasionally fall a week behind in their rent, he nevertheless stated that Plenry Louis was "a good pay master.” He stated that Henry Louis’ clothes were kept at the apartment, that his meals were cooked by Pearl, that while she was not there during the lunch hour, the deceased would frequently fix his own lunch, and, in short, that he lived there day and night.
David Owens, the owner of the grocery store previously referred to, testified that he knew the decedent and his concubine, Pearl Riley, and that they purchased groceries from him. He stated further that they spent in the neighborhood of between $15 and $20 per week for groceries. This witness, while called by the defendant, stated that the decedent was “awful good to his mother,” and that he paid on occasions for groceries for her. He went further and stated that when the plaintiff’s Welfare allowance was cut and she ran her bill up to around $70 that the decedent himself reduced it over a period of months to the amount of $7.
Mary Prater testified that she was the common law wife of Henry Carter and that they lived in and shared the apartment rented by the decedent and his concubine. She confirmed the fact that the rental was $28 per month, of which each couple contributed the amount of $14. She testified that she knew that the decedent and Pearl were paying for their furniture; that the decedent actually lived there and ate three meals a day, two of which were cooked by Pearl. She testified that she did not know as a fact whether or not the decedent *741 made any contributions to his mother. She did state that the couple dressed well and would go out on parties and use the automobile together. In rebuttal Herman was recalled to the stand and testified that he was present when the statement previously referred to was taken from Pearl Riley and that she was not coached by the plaintiff or persuaded in any way to state the facts she did. He went further and said that Pearl did not say or indicate that she was frightened and that she never denied the truthfulness of the statements made by her.
The plaintiff herself was again placed upon the stand and she too testified that she had no discussion with Pearl previous to the latter’s giving her statement.
The sole question presented by this appeal is one of fact, i. e., whether or not the evidence adduced establishes that the plaintiff was dependent upon her deceased son within the meaning and intendment of LSA-R.S. 23:1252. A reading of the above and foregoing will reveal that this question can be determined solely by the parol testimony of the various witnesses who testified at the trial. As is so often the case, the testimony is, on many points, in direct conflict. The question then resolves itself into a matter of who was telling the truth and who was not. The trial judge, while he did not render written reasons for judgment, ruled against the plaintiff and, undoubtedly, his ruling was based on the fact that he did not believe the testimony given by the plaintiff and those who testified on her behalf.
While we certainly are unable to say that the trial judge committed manifest error in disregarding the testimony introduced by plaintiffs and accepting that introduced by defendant to prove that decedent made no substantial contribution to support of his' mother, plaintiff herein, nevertheless we find uncontradicted in the testimony of defendant’s own witness, David Owens, that the decedent during the year before he was killed reduced a past due account
by his mother from $70 to $7, from about May 1954 up until the time of his death, which prevented his payment of the balance according to Owens. We thus find it un-contradicted that in the year prior to his death, decedent contributed $63 to support his mother.
LSA-R.S. 23:1231 provides in part:
“* * * If the employee leaves legal dependents only partially actually dependent upon his earnings for support at the time of the accident and death, the weekly compensation to be paid shall be equal to the same proportion of the weekly payments for the benefit of persons wholly dependent as the amount contributed by the employee to such partial dependents in the year prior to his death bears to the earnings of the deceased at the time of the accident.”
If the plaintiff mother were wholly dependent upon decedent' at the time of his death, she would be entitled to 32J4% of his weekly wages, .LSA-R.S. 23:1232. At the time of his death, decedent was employed at a weekly wage of $28.50 per week, 32}4% of which amounts to a compensation rate of $9.26 per week. Under the formula of compensation benefits for partial dependency, plaintiff is to receive the same proportion of $9.26 per week, as decedent’s total contribution (i. e., $63) to her support during the year prior to his death, bear to his annual earnings or the rate thereof during the year prior to his death, Sandidge v. Aetna Casualty & Surety Co., La.App. 1 Cir., 29 So.2d 522 (certiorari denied); Little v. Crow-Edwards Lumber Co., 7 La.App. 304. Since under the most favorable computation possible to claimant, she is entitled to less than 6% of the compensation rate of $9.26, or to compensation at a rate of 55^ per week, it is apparent that she is entitled to the minimum weekly compensation payable under the Act, of $3 per week, see LSA-R.S. 23:1202, which amount will be awarded to her for the 300 weeks duration, LSA- *742 R.S. 23:1231, as in similar circumstances was done in Lunlcin v. Triangle Farms, Inc., La.App. 1 Cir., 24 So.2d 213; Powell v. Paramdunt-Richards Theatres, Inc., La.App., 22 So.2d 859. Although plaintiff claims recovery of medical and funeral expenses incurred by reason of her son’s injury and death resulting from the accident in the course of employment, there is no proof in the record as to such expenses, and this portion of the claim is non-suited.
For the above and foregoing reasons, it is ordered that the judgment appealed from is hereby reversed, annulled, and set aside, it is ordered, adjudged, and decreed that there be judgment herein in favor of plaintiff, Suzette Thomas, and against the defendant, St. Paul Mercury Indemnity Company, awarding her compensation at the rate of $3 per week for a period not to exceed 300 weeks from March 30, 1955, with legal interest upon each unpaid installment from date of- delinquency until paid. Defendant-appellee is cast with all costs of these proceedings.
Reversed and rendered.