89 So.2d 399

**J. W. CARRINGTON**

v.

**CONSOLIDATED UNDERWRITERS.**

No. 42474.

June 11, 1956.

Rehearing Denied June 29, 1956.

Gravel, Humphries, Sheffield & Mansour, Alexandria, for plaintiff-relator.

Theus, Grisham, Davis & Leigh, Monroe, for defendant.

HAMITER, Justice.

The writ of certiorari or review was issued in this workmen's compensation suit principally on the complaint of plaintiff that the Second Circuit Court of Appeal, contrary to decisions of other courts of appeal and of this court, had computed his compensation payments upon a five day, instead of on the required six day, work week. See 80 So.2d 427.

Plaintiff also complained in his application for the writ that the Court of Appeal erred (1) in refusing to take into consideration his weekly overtime earnings in the computation of the compensation rate, (2) in affirming that part of the judgment of the district court which rejected his demand to be paid as for permanent disability, it having awarded total disability compensation only from the date of the accident on December 10, 1952 to and including December 31, 1953, less payments previously made, and (3) in denying his claim for penalties and attorney's fees under LSA–R.S. 22:658.

As to the extent and duration of plaintiff's disability, which is wholly an issue of fact between the parties, we find no manifest error in the conclusion of the district court as approved by the Court of Appeal.

Plaintiff was accidently injured on December 10, 1952 by a log striking his left leg, he at the time having been engaged in the rolling of logs on a skidway at the saw mill of his employer, the Carroll W. Max-well Lumber Company. Previously, he had undertaken other saw mill work for that campany such as catching boards as they came from the saw (termed tailing the saw), stacking lumber, and setting blocks (operating the carriage used in feeding logs to the saw). As a result of the accident he suffered a partial tear of a ligament and injury to the medial meniscus (cartilage) in the left knee.

Initially plaintiff's knee was placed in a walking cylinder cast which he wore until December 31, 1952. Later, on January 17, 1953, surgery was resorted to with a view of repairing the damaged ligament and cartilage.

On or about March 9, 1953, at the suggestion of his attending physician, plaintiff sought to resume his regular work. However, he was then unable to satisfactorily perform it, and a medical examination on April 7, 1953 disclosed "a little evidence of low-grade bursitis present just below the knee."

This suit was filed April 9, 1953, and the trial thereof commenced on October 28, 1953. Meanwhile, further examinations of plaintiff were made by several physicians and about which they testified. They agreed that the operation appeared to be successful; that the scar had completely healed; and that although plaintiff continued to complain of swelling and pain in the knee they could find no evidence of swell-

ing or reason for the pain. As stated by one of plaintiff's doctors in a written report dated August 21, 1953: "The patient's psychological attitude is poor. He feels that it will be, as he understands it at least, 6 to 12 months before he recovers to an improved condition. He was assured that there was no reason for such pessimism regarding his condition."

True, the physicians further agreed that there was a limitation of from five to ten percent in the use of the left leg due to a slight atrophy of the thigh muscles (resulting from disuse), for the overcoming of which condition exercise was needed. However, some of them testified that the prognosis was for a complete recovery of the use of the leg, there being no loss of function in the knee itself, and most of them said that the limitation noted would not prevent his doing work the same as or similar to that which he was engaged in at the time of the accident. In this connection the record discloses that when the trial commenced in October, 1953 plaintiff was employed as a log truck driver, receiving larger wages than when injured ($1 per hour, as compared with 85 cents per hour in his previous saw mill work), and that on the reopening of the case some eight months later he was still so regularly employed.

Some lay witnesses testified about plaintiff's continual complaint of pain and swelling in his knee. However, as pointed out above the pain complaint was purely subjective; and no evidence of swelling was observed by any of the physicians, notwithstanding their numerous examinations and their instructions that he was to appear for observation when any swelling occurred.

Considering the evidence as a whole we are unable to say that the district court and Court of Appeal erred in the award of compensation as for total disability from the date of the accident to and including December 31, 1953, less the payments already made.

Neither can we conclude that the Court of Appeal ruled incorrectly in denying the penalties and attorney's fees demanded by plaintiff under LSA–R.S. 22:-658. These are to be imposed, according to the statute, when an insurer fails to pay a claim within sixty days after receipt of satisfactory proofs of loss and if such failure is found to be arbitrary, capricious or without probable cause.

The record establishes that the defendant commenced making compensation payments to plaintiff shortly after receiving notice of the injury, and that they were continued regularly until March 18, 1953. On that date they were stopped, defendant's physician having instructed plaintiff to resume his duties at the saw mill. True, the doctor was aware of a slight limitation in the use of the left leg, but he thought it would not hinder plaintiff in his work and that the

leg should be exercised. Too, it appears that at such time plaintiff's attorney was negotiating with defendant for a settlement of the entire claim.

When it became evident that an agreement of settlement could not be reached, and a further medical examination revealed (as above shown) some evidence of bursitis below the knee, defendant resumed the making of payments. Thus, on April 27, 1953 plaintiff was sent a check in the amount of $132.60, which covered compensation for the intervening six weeks' period, and it was accepted by him. Thereafter compensation checks were issued until July 15, 1953. They were discontinued on that date, because defendant's doctors previously reported that plaintiff should then be able to return to his regular employment.

Counsel for plaintiff argue that defendant's refusal to pay compensation benefits on the basis of a six day work week (it was computed on a five day work week) rendered applicable the invoked penalty provisions. In the record is a written statement signed by plaintiff on January 7, 1953 which recited: "My wages were 85 cents per hour and we worked a 40-hour week." Obviously, defendant's computation of the weekly compensation payments was predicated largely on that recitation. Moreover, there is nothing to indicate that plaintiff ever made demand on defendant to increase the payments or that he complained of the manner of computing them.

In view of the mentioned facts and circumstances it does not appear that defendant's actions with respect to the payment of compensation were arbitrary, capricious or without probable cause. Hence, plaintiff is not entitled to recover the penalties and attorney's fees demanded.

The question that primarily caused our issuing the writ of certiorari herein, and with which we are chiefly concerned, is whether the Court of Appeal correctly computed plaintiff's compensation payments on a five day, rather than on a six day, work week.

The Court of Appeal found as a fact that plaintiff ordinarily worked eight hours per day during a five day week, and it held that his compensation should be computed on that basis. As authority for the holding it cited Caddo Contracting Co. v. Johnson, 222 La. 796, 64 So.2d 177, 182, particularly the statement therein (taken out of context) reading: " * * * the weekly compensation award must be based on the employee's earnings at the time of his injury, and this is determined by taking his then daily rate of pay and multiplying it by the number of days customarily worked per week."

In the Johnson case, with respect to the compensation due to the dependents of the deceased employee, we observed: "But the exact amount due these minors (their claim is the only one before us, the widow having neither appealed nor filed answer to plain-

tiff's appeal) can not be determined presently for the reason that the record fails to disclose the wages of decedent, as prescribed by the statute, on which computation should be made. On this point the evidence, given by plaintiff's bookkeeper, is merely to the effect that for the year 1950 the decedent (who was killed in November, 1950) averaged $80.29 per week. Presumably, this figure was arrived at by dividing his total earnings during that year by the number of weeks which he worked; and it is possible that in the early part of the period his wages were more than at the time of his death, or vice versa. This method, if such was used, is improper. The term 'wages' is defined in the statute as 'the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury.' LSA–R.S. 23:1021. Hence, the weekly compensation award must be based on the employee's earnings at the time of his injury, and this is determined by taking his then daily rate of pay and multiplying it by the number of days customarily worked per week. Rylander v. T. Smith & Son, Inc., 177 La. 716, 149 So. 434; Calhoon v. Meridian Lumber Co., Inc., 180 La. 343, 156 So. 412; Buxton v. W. Horace Williams Co., 203 La. 261, 13 So.2d 855, and Troquille v. Estate of Lacaze, 222 La. 611, 63 So.2d 139."

In reviewing some of the decisions thus cited in support of our conclusion in the Johnson case we stated in Jarrell v. Travelers Insurance Co., 218 La. 531, 50 So.2d 22, 23, as follows: "In the case of Rylander v. T. Smith & Son, Inc., 177 La. 716, 149 So. 434, this court had occasion to determine the amount of compensation to be paid per week to a longshoreman employed intermittently, and after reviewing the history of the Act, particularly Section 8 thereof in its present form * * *, adopted the view followed by the Courts of Appeal for the Parish of Orleans and the Second Circuit, namely, that an injured workman is entitled to compensation at the rate of pay in effect on the actual day of the injury, based not upon the number of days per week he was employed but upon the number of days he could possibly have secured employment had he not been injured, or six days a week; * * *.

"This view was adhered to in the later case of Calhoon v. Meridian Lumber Co., Inc., 180 La. 343, 156 So. 412, * * *."

Accordingly, it is obvious that the import of our above quoted observation and conclusion in the Johnson case was that the daily rate of pay at the time of the injury should be multiplied by the number of days customarily worked as set out in the cases which we cited—six days per week. There is nothing in the opinion to indicate an intention to change or modify in any way the rationale of the cited decisions.

Of course, there was and is in our jurisprudence the case of Barr v. United Gas

Public Service Co., 183 La. 873, 165 So. 129, in which compensation was computed on the basis of a forty hour work week (four days of ten hours each), the Proposed Gas Code of the American Gas Association having specifically limited the employee's weekly employment to that period. But that decision was not relied on or even cited in the Johnson case, and it is clearly not applicable to this cause as hereinafter shown.

In the instant controversy there was no contract of employment or regulation restricting plaintiff to a five day work week. True, his employer undertook the actual sawing of logs during only five days of each week. However, on the sixth day the company always engaged in certain other operations, such as cleaning up, stacking and loading lumber, and running a planer; and in these plaintiff sometimes assisted, although he was not required to do so.

■ Our conclusion is, therefore, that plaintiff's compensation should have been computed on a six day, rather than on a five day, work week.

Since we have concluded that plaintiff was entitled to be compensated on the basis of a six day work week his final complaint seems to have been overcome to some extent, it being that his overtime earnings should be taken into consideration in the computation.

As pointed out by counsel for plaintiff there are cases in our jurisprudence in which overtime pay was considered in fixing compensation. However, in some it was used in determining an average weekly wage, and this we have shown to be improper. Anderson v. H. & H. Trucking Co., Inc., La.App., 23 So.2d 293 and Barrilleaux v. Hartford Accident & Indemnity Co., La.App., 11 So.2d 48. In another it was considered in arriving at an average daily wage based on an average weekly wage (which in effect is nothing more than figuring the average weekly wage), after which compensation was awarded as for a five day work week. Abbott v. Swift & Co., La.App., 6 So.2d 683. In still another (clearly unlike the present controversy) the employee was *regularly employed at an overtime rate,* the record therein disclosing that he worked a ten hour day (the usual eight hours plus two hours overtime). Buxton v. W. Horace Williams Co., 203 La. 261, 13 So.2d 855.

■ This plaintiff was not required to and he did not work overtime as part of his regular job. Of course, during some of the nineteen weeks of his entire employment he was permitted to engage in overtime labor. But it was intermittent, irregular and spasmodic; and in some weeks he did not work even forty hours. Under these circumstances we are of the opinion that overtime earnings should not be considered in determining the daily rate of pay.

For the reasons assigned the judgment of the Court of Appeal is amended by increas-

ing plaintiff's weekly compensation rate from $22.10 to $26.52, and as amended it is affirmed. Defendant shall pay the costs of the proceedings in this court.

On Applications for Rehearing.

PER CURIAM.

Counsel for the defendant has requested that we clarify our interpretation of LSA–R.S. 23:1021(11) by granting a rehearing, or, in the alternative, by issuing a per curiam in this case. Although we thought we had made ourselves clear, we shall nevertheless explain the extent of our decree.

LSA–R.S. 23:1021(11) [1] has been a source of repeated confusion. In the case of Rylander v. T. Smith & Son, Inc., 177 La. 716, 149 So. 434, we stated that one of the purposes of the Workmen's Compensation Statute was to insure the employee against the loss or diminution of earning capacity. We held that compensation should be based upon the number of days the workman could have secured employment had he not been injured. The test employed was ability to work. In Calhoon v. Meridian Lumber Co., 180 La. 343, 156 So. 412, we said that economic conditions, which compelled an employee to work half time, would not prevent his recovery of workmen's compensation on the basis of a six day week. In Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22, we attempted to straighten out apparent difficulties and clarify our former decisions. We held that an injury had the effect of depriving a workman of his ability to work at full time employment in the future, and that he should be compensated on a six day work week. The ability to work test was again employed in Troquille v. Lacaze's Estate, 222 La. 611, 63 So.2d 139.

The use of the word "customarily" in Caddo Contracting Co. v. Johnson, 222 La. 796, 64 So.2d 177, was not intended to mean that an employee's weekly wages would be computed upon the number of days he actually or customarily worked for the particular employer, by whom he was employed at the time of the injury. We were referring to the fact that the average able-bodied employee customarily worked six days a week.

■ After determining an employee's daily wage, the six day week is to be employed in calculating his weekly wage. If he is injured, he is deprived of this ability to work six days per week, and remuneration is awarded him for this deprivation. This test must be applied regardless of the number of days he works for the particular employer, by whom he is employed at the time of his injury.

1. " 'Wages' means the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury."

Since we are convinced that our decree is correct, both applications for rehearing are refused.

HAWTHORNE, J., concurs in the decree.